# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

David Martin,                                    Civ. No. 08-4704 (DWF/JJK)

       Plaintiff,

v.                                               **REPORT AND RECOMMENDATION**

Michael J. Astrue,
Commissioner of Social Security,

       Defendant.

---

Lionel H. Peabody, Esq., Peabody Law Office, counsel for Plaintiff.

Lonnie F. Bryan, Esq., Assistant United States Attorney, counsel for Defendant.

---

JEFFREY J. KEYES, United States Magistrate Judge

       Pursuant to 42 U.S.C. § 405(g), Plaintiff David Martin seeks judicial review of the final decision of the Commissioner of Social Security ("Commissioner"), who denied Plaintiff's application for disability insurance benefits. This matter is before this Court for a Report and Recommendation to the District Court on the parties' cross-motions for summary judgment. *See* 28 U.S.C. § 636; D. Minn. Loc. R. 72.1. For the reasons stated below, this Court recommends that Plaintiff's Motion for Summary Judgment (Doc. No. 6), be denied, and Defendant's Motion for Summary Judgment (Doc. No. 14), be granted.

# BACKGROUND

## I.    Procedural History

Plaintiff filed an application for disability insurance benefits on January 31, 2003, alleging a disability onset date of August 25, 1993.  (Tr. 66-68.)[1]  His application was denied initially and on reconsideration.  (Tr. 39-43, 51-53.)  Plaintiff timely requested a hearing, which was held before an Administrative Law Judge ("ALJ") on July 21, 2004.  (Tr. 54, 455-65.)  At the hearing, the ALJ determined that Plaintiff should have a consultative examination to further develop the record, and the hearing was ended.  (Tr. 462, 464.)  Plaintiff attended the consultative examination and the report was sent to the ALJ.  (Tr. 368-90, 397-98.)  Without continuing the hearing, the ALJ issued a decision on May 27, 2005, finding Plaintiff not disabled.  (Tr. 391-400.)  Plaintiff sought review of the ALJ's decision by the Appeals Council.  (Tr. 405-10.)  The Appeals Council vacated the decision and remanded to the ALJ for further proceedings. (Tr. 419-21.)

A second hearing was held before an ALJ on September 29, 2006, whereby testimony was received from Plaintiff, Paul Anthony Olsen (Plaintiff's friend), and Kenneth Ogren (the vocational expert).  (Tr. 466-505.)  On November 16, 2006, the ALJ issued an unfavorable decision.  (Tr. 19-30.)

---

[1]     Throughout this Report and Recommendation, reference to the administrative transcript for this case, Civ. No. 08-4704 (DWF/JJK), is made by using the abbreviation "Tr."

2

Plaintiff sought review of the ALJ's November 16, 2006 decision by the Appeals Council (Tr. 16-17), and on May 30, 2008, the Appeals Council declined the request for review. (Tr. 10-14.) The ALJ's November 16, 2006 decision therefore became the final decision of the Commissioner. *See* 20 C.F.R. §§ 404.981, 416.1481. On July 15, 2008, Plaintiff filed the instant action with this Court seeking judicial review pursuant to 42 U.S.C. § 405(g). The parties thereafter filed cross-motions for summary judgment.

## II.    Factual Background and Medical History

Beginning in 1984, Plaintiff served in the Air Force for approximately nine years and eight months, working as a computer programmer on a nuclear weapons database. (Tr. 83, 472-74, 500.) He was discharged for marijuana use on August 25, 1993. (Tr. 83, 474.) After he was discharged, Plaintiff worked as a sawmill operator for two days, and tried selling real estate for a year. (Tr. 477-78.) In 1994, he applied for Veteran's Administration ("VA") disability benefits and was awarded a 100% disability rating based on a diagnosis of major depression. (Tr. 77-79.) In 1997, his disability rating was reduced to 70%, but on appeal he was granted entitlement for individual unemployability. (Tr. 81.) Plaintiff's date last insured is December 31, 1998.[2] (Tr. 469.) Plaintiff was divorced in 1999, and has lived alone since then. (Tr. 471.) Plaintiff was 38

---

[2]      A claimant has to establish "the existence of a disability on or before the date that the insurance coverage expires." *Basinger v. Heckler*, 725 F.2d 1166, 1168 (8th Cir. 1984).

years old when he filed his application for disability insurance benefits, and at the time of the ALJ's November 16, 2006 decision, he was 42 years old.  (Tr. 66, 471.)

In May 1992, while Plaintiff was in the Air Force, he complained of stress at work and sought treatment for inability to sleep.  (Tr. 208-09.)  Paul S. Desillier, PA, recommended that Plaintiff engage in an exercise program and stress management class.  (Tr. 209.)  The next month, Plaintiff reported feeling and sleeping better.  (Tr. 207.)

In November 1992, psychologist Major Alan L. Doerman at Ehrling Bergquist Strategic Hospital evaluated Plaintiff for depression and lethargy. (Tr. 203-04.)  At that time, Dr. Doerman diagnosed adjustment disorder with depression.  (Tr. 204.)

In May 1993, Plaintiff was seen by psychiatrist Major Anderson Douglass. (Tr. 202.)  Plaintiff freely admitted using marijuana in connection with an American Indian drumming ceremony.  (*Id.*)  Major Douglass concluded that Plaintiff was likely to continue with episodic cannabis use because he expressed no concern over his drug abuse pattern and did not request help.  (*Id.*)  On examination, Major Douglass observed no depressive features or overt anxiety. (*Id.*)  The next day, Dr. Doerman assigned Plaintiff a GAF score of 80.[3]  (Tr.

---

[3]       "[T]he Global Assessment of Functioning Scale is used to report 'the clinician's judgment of the individual's overall level of functioning.'"  *Hudson ex rel. Jones v. Barnhart*, 345 F.3d 661, 662 n.2 (8th Cir. 2003) (quoting the

(Footnote Continued on Next Page)

201.)  A few months later in July, Dr. Evan P. Varkony diagnosed Plaintiff with stress gastritis resulting from delays in separation from the Air Force.  (Tr. 200.)  Later that month, Lorilee H. Butler, PA, noted that Plaintiff was mildly depressed and prescribed him Elavil.  (Tr. 199.)  On August 25, 1993, Plaintiff was discharged from the Air Force.  (Tr. 83.)

In July 1994, Plaintiff requested an evaluation for stress at the VA's Medical Center in St. Cloud, Minnesota.  (Tr. 216.)  He complained about inability to sleep, and nightmares about nuclear weapons.  (Tr. 215.)  Plaintiff also reported feeling depressed and guilty about having worked in a nuclear striking area.  (Tr. 214-15)  At that time, Dr. G. Guzman noted that Plaintiff had been treated with Prozac in the past with good results, and prescribed Prozac for Plaintiff again.  (Tr. 215.)  In August, Plaintiff was also prescribed Trazadone.  (Tr. 210.)

On September 22, 1994, Plaintiff underwent a psychiatric examination with Dr. Lian Chang.  (Tr. 237-38.)  Dr. Chang noted that Plaintiff stopped taking Prozac after one month because it made him feel he "was not part of the world."  (Tr. 237.)  Dr. Chang also noted that Plaintiff started drinking and using

---

(Footnote Continued from Previous Page)
*Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. Text Revision 2000) ("DSM-IV")).  A GAF score between 71 to 80 indicates that "[i]f symptoms are present, they are transient and expectable reactions to psychological stressors (e.g., difficulty concentrating after family argument); no more than slight impairment in social, occupational, or school functioning (e.g., temporary falling behind in schoolwork)."  DSM-IV at 32.

marijuana while in the service and that he used marijuana to put himself in a hypnotic state for shamanic drumming.  (*Id.*)  Plaintiff reported that he was reprimanded for alcohol intoxication a couple of times, and that he was now drinking two beers per week.  (*Id.*)

Plaintiff also reported to Dr. Chang that he was depressed for three months prior to his discharge because he worked on a nuclear weapons database, which he felt conflicted with his Native American religion.  (Tr. 237.) He said that during that time he only showed up for work two or three days a week and did not inform his authority.  (Tr. 237.)  In addition, Plaintiff reported that since being discharged from the Air Force he has severe anxiety attacks when working his odd jobs.  (*Id.*)

In addition, Dr. Chang noted that Plaintiff "endorse[d] suicidal thoughts without plan, intent or time table."  (Tr. 238.)  Plaintiff described everything as "dark right now," and reported feeling hopeless and endorsing crying spells.  (*Id.*) He also reported having difficulty staying asleep, and having irritability, low frustration tolerance, and violent thinking.  (*Id.*)  Plaintiff reported that his hobbies were playing guitar with a band, fishing, and writing poems or short stories.  (*Id.*)

Dr. Chang reported that Plaintiff's mood was dysphoric, affect was flat with little reaction, and speech was soft, monotonous, and with a low voice.  (*Id.*) Dr. Chang noted that Plaintiff's form of thought was coherent and goal directed, but that he appeared preoccupied with his overt guilt and shame from previously working on a nuclear weapons database.  (*Id.*)  Dr. Chang diagnosed Plaintiff

with major depression, recurrent, and marijuana abuse, continuous. (*Id.*) At that same time, Dr. Frank E. Martin reported upon examination that Plaintiff was in good physical health. (Tr. 236.)

Several months later, Dr. Chang opined that it was not clear at the time whether Plaintiff's depression was due to substance use or due to dismissal from the Air Force. (Tr. 235.) He also noted that Plaintiff had paranoid qualities concerning medications and his involvement with a nuclear weapons database. (*Id.*)

On December 12, 1994, the Department of Veteran's Affairs granted Plaintiff entitlement to service-connected disability for a psychiatric disorder, and a 100% evaluation was assigned. (Tr. 77.) The Department of Veteran's Affairs reviewed the above-described medical records in making its decision. Among other things, the Department's decision states the following:

> Entitlement to Chapter 35 benefits is dependent upon the permanence of a total disability. Although the veteran is currently considered totally disabled, the permanency is not established due to major improvement being anticipated by his treatment at VA Medical Center, St. Cloud.

(Tr. 73.) Thereafter, in February 1995, Dr. Guzman discharged Plaintiff from mental health treatment for lack of compliance. (Tr. 210.)

On November 2, 1995, Plaintiff underwent a psychiatric evaluation with Dr. J.C. Whitacre, II. (Tr. 233-34.) At that time, Plaintiff reported that he was working as a real estate salesman, but that he was not doing well because he "[did] not care about putting in the time to establish a business." (Tr. 233.)

Plaintiff reported that he spent one hour a day playing base drums and teaching himself to play guitar, and stated that he did the cooking for himself and his wife, and took care of the house.  (*Id.*)  He also stated that he goes fishing and brewed his own beer, which he liked to drink before going to bed.  (*Id.*)  Plaintiff reported that he was smoking less marijuana because he was no longer doing shamanic drumming.  (*Id.*)  He also reported that he had some difficulty staying asleep and had occasional nightmares.  (*Id.*)  He also stated that he had a lot of anger toward himself and that if he would go into a bar he would likely get into a fight.  (*Id.*)  Plaintiff denied suicidal intent, hallucinations, or delusions.  (Tr. 233-34.)  At that time, Dr. Whitacre diagnosed major depression, recurrent, and marijuana abuse, continuing.  (Tr. 234.)

On August 29, 1996, Dr. Whitacre examined Plaintiff for a "Compensation and Pension Exam."  (Tr. 229-31.)  Dr. Whitacre noted that Plaintiff had quit selling real estate in November 1995, and had not worked since then.  (Tr. 229.)  Plaintiff reported that he was working as a volunteer radio announcer for a three-hour night show approximately every other week.  (*Id.*)  On the radio show, he played records, talked, and sang some of his own songs.  (*Id.*)  Plaintiff also mentioned that he played music with a couple of friends and that they smoked marijuana occasionally.  (Tr. 230.)

In addition, Plaintiff reported that he did not have energy to do much of anything.  (*Id.*)  He gave up cigarettes, reduced his marijuana consumption, and cut back on drinking the beer he brewed.  (*Id.*)  He had not been to the hospital

or taken any medication in two years.  (*Id.*)  Plaintiff reported that his interests

were becoming increasingly restricted and that he had problems with his temper.

(*Id.*)  However, he continued to practice tai chi, and was planning to act as a

scorekeeper for his wife, who was starting a coaching job.  (*Id.*)

On examination, Dr. Whitacre noted that Plaintiff's affect appeared

somewhat depressed, but that he denied nightmares or hallucinations.  (*Id.*)

Plaintiff did admit to suicidal thoughts, but reported no attempts.  (*Id.*)

Dr. Whitacre continued his diagnoses of major depression, recurrent, and

marijuana abuse.  (*Id.*)

On September 24, 1996, Plaintiff was notified by the Department of

Veterans Affairs of its proposal to reduce his 100% disability evaluation to 70%.

(Tr. 90, 102-04.)  Thereafter, the Department reduced Plaintiff's disability

evaluation to 70% stating the following:

> While the veteran definitely has problems, there is no
> evidence that they result in total occupational and social
> impairment.  The evidence does not establish that the
> veteran is unable to obtain or retain any type of
> substantially gainful occupation as a result of his
> service-connection depression.  The veteran says he
> still does two volunteer radio shows a month.  There is
> no evidence that his social interaction is so adversely
> affected by the depression as to result in virtual
> isolation.  Finally, there is no evidence of ongoing
> treatment for depression or medication being taken to
> control it.
>
> . . . .
>
> A higher evaluation of 100 percent is not warranted
> because the evidence does not demonstrate total

9

occupational and social impairment, due to such symptoms as: gross impairment in thought processes or communication; persistent delusions or hallucinations; grossly inappropriate behavior; persistent danger of hurting self or others; intermittent inability to perform activities of daily living (including maintenance of minimal personal hygiene); disorientation to time or place; memory loss for names of close relatives, own occupation, or own name. An evaluation of 100 percent is also not warranted because the evidence does not establish inability to secure or follow a substantially gainful occupation.

(Tr. 102-03.)

On April 23, 1997, Plaintiff met with Dr. Whitacre for another psychiatric examination. (Tr. 226-28.) At that time, Plaintiff reported that he spent four or five hours a day on his music, and was now playing a keyboard. (Tr. 226.) He still volunteered at the radio station, and still occasionally played music or sang his own songs on the radio. (Tr. 226-27.) Plaintiff reported that he gave up marijuana about six months prior and gave up drinking his home brewed beer, but that he started smoking cigarettes again. (Tr. 227.) Plaintiff continued to do tai chi, but he gave up his connection with the Native American community. (*Id.*) At this time, Plaintiff stated that he was losing interest in most of his activities. (*Id.*) Plaintiff reported that he had not received treatment or medication for his condition. (*Id.*) Dr. Whitacre noted that Plaintiff's wife had submitted a letter stating that she did most of the driving because Plaintiff was too unstable and preoccupied behind the wheel. (*Id.*) She also noted that Plaintiff had a problem with his temper, but he denied any violence. (*Id.*)

On examination, Dr. Whitacre noted that Plaintiff appeared somewhat depressed.  (*Id.*)  Dr. Whitacre also reported that Plaintiff had continued difficulty with sleep and occasional bad dreams, but had no current history of hallucinations or delusions, and had not been actively suicidal.  (*Id.*)  Dr. Whitacre diagnosed Plaintiff with major depression, recurrent, and stated that his marijuana abuse was said to be in remission.  (*Id.*)  He also diagnosed Plaintiff with personality traits in Cluster A distribution,[4] and as having moderate psychosocial stressors including unemployment, social isolation, and increasing anhedonia.  (*Id.*)  At that time, Dr. Whitacre estimated Plaintiff's GAF score at 50.[5]  (Tr. 228.)  On physical examination on the same date, Dr. Frank E. Martin found Plaintiff to be in good physical health.  (Tr. 224-25.)

Thereafter, on August 18, 1997, the Department of Veterans Affairs made the following finding based on Plaintiff's April 23, 1997 examination:

> Entitlement to individual unemployability is granted because the claimant is unable to secure or follow a substantially gainful occupation as a result of service-connected disabilities.

---

[4]   The DSM-IV lists ten personality disorders and contains the category "personality disorder, not otherwise specified" for behavior patterns that do not match the ten disorders, but nevertheless exhibit characteristics of a personality disorder.  DSM-IV at 629.  The personality disorders are grouped into three clusters (A, B, and C).  *Id.*  Cluster A personality disorders are those considered to be marked by odd, eccentric behavior.  *Id.* at 630.

[5]   GAF scores of 41 to 50 reflect "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."  DSM-IV at 34.

> VA examination dated April 23, 1997 shows the veteran
> to be in good physical health.  He continues to be
> depressed, anhedonic and inactive except for musical
> activities which do not result in income.  The veteran
> has not been employed since December 1995 when he
> worked as a realtor and he has not applied for a job
> since May or June 1996.

(Tr. 81.)

The next record of medical treatment is five years later on July 3, 2002, which was after Plaintiff's date last insured of December 31, 1998.  Plaintiff went to the Twin Ports VA Outpatient Clinic to "establish care."  (Tr. 221.)  Plaintiff was referred to social worker Jeff Hall, whom he met with on January 30, 2003.  (Tr. 222, 297.)  Hall noted that Plaintiff reported many symptoms normally associated with post traumatic stress disorder.  (*Id.*)  Hall administered the Beck depression scale and the Beck anxiety inventory, and Plaintiff scored a ten and twenty respectively.  (*Id.*)[6]  Plaintiff reported having thoughts of suicide but that he would not carry them out.  (*Id.*)  He also reported having difficulty around crowds of people, being startled by loud unexpected noises, and being quick to anger.  (*Id.*)  In response to a referral to psychiatry, Plaintiff stated that "[he did not] want to get drugged up," but he eventually agreed to the referral.  (*Id.*)

---

[6]     A clinically depressed person typically scores in the fourteen to twenty-eight range on the Beck Depression Inventory.  Gary Groth-Marnat, *Handbook of Psychological Assessment* 588 (4th ed. John Wiley and Sons 2003).  A score of twenty on the Beck Anxiety Inventory indicates moderate to severe anxiety.  Ian McDowell, *Measuring Health: A Guide to Rating Scales and Questionnaires* 307 (3rd ed. Oxford University Press 2006).

On April 9, 2003, Plaintiff met with Hall again and reported that he did not think he had slept in two weeks. (Tr. 266.) Plaintiff attributed his sleep difficulties to the extensive coverage of the war on television. (*Id.*) Plaintiff reported that he spent his days in the house with his dog, cat, and fish, and that he liked animals better than people. (*Id.*) Plaintiff stated that he does "get out some" to walk his dog. (*Id.*) Hall noted that it occurred to Plaintiff "to involve himself in volunteer activities as he begins to feel better." (*Id.*)

On April 9, 2003, Plaintiff also saw staff physician Dr. Joseph Spencer. (Tr. 263-65.) Plaintiff reported that he experienced his first mental health contact around 1984 when he was referred to alcohol rehabilitation, and his first psychiatric contact around 1991, when he saw a military psychiatrist who prescribed antidepressants to him. (*Id.*) Plaintiff remembered taking Trazadone, which helped him sleep, but left him feeling groggy. (Tr. 263-64.) He stated that antidepressants made him feel as though he had less control over his anger. (Tr. 264) For example, Plaintiff reported punching holes in the wall and ruining four doors in his house. (*Id.*) Plaintiff reported that he was self-medicating to a degree by drinking alcohol. (*Id.*) Dr. Spencer diagnosed Plaintiff with depressive disorder by history, with nicotine dependence, a history of alcohol use, moderate social stressors, and a GAF score of 35.[7] (Tr. 265.) Antidepressant treatment

---

[7]     GAF scores of 31 to 40 indicate the individual has an "impairment in reality testing or communication . . . or [a] major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood . . . ." DSM-IV at

(Footnote Continued on Next Page)

was not pursued further at this time.  (*Id.*)  However, in June 2003, Dr. Spencer

prescribed Plaintiff Wellbutrin for depression.  (Tr. 250.)

In July 2003, Plaintiff saw nurse practitioner Janice Doe and reported

drinking approximately a quart of Bacardi rum and two or three beers a week.

(Tr. 342.)  The next month, Plaintiff sought a different antidepressant from

Dr. Spencer, who then prescribed Plaintiff Mirtazapine.  (Tr. 341.)  In late

September 2003, Dr. Spencer noted that Plaintiff was tolerating the Mirtazapine

and looked and felt less anxious.  (Tr. 340.)  At that time, however, Plaintiff

reported feeling more apathetic.  (*Id.*)  Dr. Spencer continued and renewed

Plaintiff's Mirtazapine prescription.  (*Id.*)

On September 2, 2003, and after reviewing Plaintiff's file, Psychologist

Patrick Shields completed a Mental Residual Functional Capacity Assessment

and Psychiatric Review Technique Form as to Plaintiff.  (Tr. 308-25.)  On the

Psychiatric Review Technique Form, Dr. Shields indicated that a RFC

assessment of Plaintiff was necessary based upon Listings 12.04 affective

disorders and 12.09 substance addiction disorders.  (Tr. 312.)  Specifically,

Dr. Shields indicated that a medically determinable impairment was present that

did not precisely satisfy the diagnostic criteria for a 12.04 affective disorder.

(Tr. 315.)  Dr. Shields described Plaintiff's disorder using the terms "angry," "flat

affect," and "anxiety."  (*Id.*)   In addition, regarding Plaintiff's functional limitations,

(Footnote Continued from Previous Page)
32.

Dr. Shields opined that Plaintiff was mildly restricted in activities of daily living, moderately restricted in maintaining social functioning, moderately restricted in maintaining concentration, persistence, or pace, and had one or two episodes of decompensation, each of extended duration.  (Tr. 322.)  Ultimately, regarding Plaintiff's mental residual functional capacity, Dr. Shields stated the following:

> [Plaintiff] retains the capacity to concentrate on, understand, and remember routine, repetitive instructions, but would have marked problems with both detailed and complex instructions.
> [Plaintiff's] ability to carry out tasks with adequate persistence and pace would be moderately impaired, but adequate for routine, repetitive tasks, but not for detailed or complex tasks.
> [Plaintiff's] ability to interact and get along with co-workers would be moderately impaired, but adequate for brief and superficial contact.
> [Plaintiff's] ability to interact with the public would be moderately impaired, but adequate for brief and superficial contact.
> [Plaintiff's] ability to accept supervision would not be significantly impaired.
> [Plaintiff's] ability to sustain an ordinary routine without special supervision is not significantly impaired.
> [Plaintiff's] ability to handle stress would be moderately impaired, but adequate to tolerate the routine stressors of a routine, repetitive work setting.

(Tr. 310.)

In January 2004, Plaintiff visited Dr. Spencer again and reported that he still had some drowsiness, but that he had decreased his beer consumption.  (Tr. 365.)  At that time, Dr. Spencer increased Plaintiff's Mirtazapine.  (*Id.*)  In April, Plaintiff was able to drive himself to his appointment, which both Dr. Spencer and Plaintiff agreed he would not have done a few months ago.  (*Id.*)

Dr. Spencer also noted that Plaintiff was not suicidal, and was drinking much less.  (*Id.*)

On October 1, 2004, Plaintiff underwent a psychological evaluation with Psychologist M. Jeffrey Toonstra at Northland Counseling Center.  (Tr. 368-72.) Dr. Toonstra noted that Plaintiff presented "with a low volume, flat voice, appearing tired with a sad affect."  (*Id.*)  At that time, Plaintiff reported that he was able to sleep four to five hours a night, but that he still had dreams about nuclear destruction.  (Tr. 368.)  He also reported that he does not like big cities or being around a lot of people, that he had no desire to "be any part of life," and that he had slept only two hours the night before due to anxiety.  (*Id.*)  Plaintiff indicated that he preferred to stay in the basement of his house, where he felt safe, and that he saw himself as more irritable than anxious.  (*Id.*)  He stated that reading irritates him, that his attention is "gone," that he believes his memory is worsening, and that he has difficulty completing tasks.  (Tr. 368-69.)  Plaintiff identified that he did not like to take medication because they did not treat the problems.  (Tr. 369.)  Plaintiff further stated that he was not going to change, that things were not going to change, and that the problems were with the world and not "with his brain chemistry."  (*Id.*)

Plaintiff told Dr. Toonstra that he played the guitar one to two times per week, walked his dog daily, practiced Tai Chi, watched television, and did chores once in a while, but sometimes got distracted before finishing.  (*Id.*)  Plaintiff also used his computer, but would go for days without turning it on.  (Tr. 369-70.)

Plaintiff reported that he owned his house and lived with a dog and cat. (Tr. 370.) Plaintiff was divorced in 1999, and reported that he felt emotionally detached and had no real interest in dating. (*Id.*) He indicated that he had not smoked marijuana for over a year, but that he occasionally would drink a bottle of wine. (*Id.*)

During this evaluation, Plaintiff completed the MMPI-2 test. Dr. Toonstra reported that the results "suggested the strong possibility of a blatant response set of over-representing mental-health problems, in terms of exaggerating symptoms, [and] noting he endorsed an unusual number of psychological symptoms." (Tr. 370.) Dr. Toonstra opined that "based on interviewing [Plaintiff], that reading ability, confusion, disorientation, and stress would all be ruled out and the response set is likely the results of desire to present in a light suggestive of mental-health problems." (*Id.*) Dr. Toonstra explained that nevertheless, the results were considered cautiously valid because the MMPI-2 results reflected some consistency with a Schizoid Personality Disorder and suggested "problematic adjustment in terms of anxiety and mood," which were consistent with Plaintiff's presentation and report of concerns. (*Id.*) Dr. Toonstra diagnosed Plaintiff with depressive disorder NOS, as having schizoid personality disorder features, as having psychological and environmental stressors (i.e., isolation, limited social support, limited finances, and limited community involvements),

and as having a current GAF score of 55.[8]  (Tr. 371.)  He opined that Plaintiff

appeared to be capable of understanding, remembering and following simple

instructions, with some difficulty sustaining attention and carrying out work-like

tasks with reasonable persistence or pace.  (Tr. 372.)  He also stated that

Plaintiff appeared to be capable of responding appropriately to "brief and

superficial contact" with coworkers and supervisors, but "would not [likely]

tolerate well the stress and pressure typically found at an entry-level workplace,"

and given his schizoid personality features would likely amplify problems when

interacting with others and following directions.  (*Id.*)

## III.    Hearing Testimony

### A.    Plaintiff's Testimony

At the September 29, 2006 administrative hearing, the ALJ noted that the

primary issue to be decided was whether Plaintiff could prove disability prior to

December 31, 1998.  (Tr. 469-70.)  Plaintiff testified as to his employment history

prior to that date.  He stated that he was in the Air Force for nine years and eight

months, and that after being discharged, he applied for and was granted 100%

service-connected disability benefits in 1994.  (Tr. 472-76.)  Plaintiff testified that

the problems that he had at that time that were the basis for the grant were his

total lack of interest in life, being somewhat suicidal, having anger issues, having

---

[8]      GAF scores of 51 to 60 indicate "[m]oderate symptoms (e.g., flat affect and
circumstantial speech, occasional panic attacks) OR moderate difficulty in social,
occupational, or school functioning (e.g., few friends, conflicts with peers or co-
(Footnote Continued on Next Page)

low patience and tolerance, and not following orders well.  (Tr. 477.)  Plaintiff explained that he tried working at a sawmill for two days in 1994, but did not go back because of the "overall monotony of it."  (*Id.*)  Then, Plaintiff tried to sell real estate for a year, but got agitated with having to be in the office.  (Tr. 478.) About that same time, he interviewed for a job as a computer programmer, but did not get the job.  (Tr. 479-81.)  He explained that he was stressed about the interview, and ultimately did not think he would have lasted at the job because he has a hard time working with computers because of the bad memories and the nightmares he has every night.  (Tr. 479-81.)  Plaintiff also testified that since 1995, he has volunteered off and on to host a radio show once or twice a month, three hours a day.  (Tr. 481-82.)  But even though he loves music, he testified that he could not work anywhere more than two or three days a week.  (Tr. 483-84.)

Regarding Plaintiff's mental health problems, Plaintiff testified that his worst symptom is that he "[does not] care if [he] live[s], die[s] or go[es] insane." (Tr. 485.)  He testified that he does not remember the last time he had good sleep, and that all of his nights "end in mushroom clouds."  (Tr. 487.)  He also testified that his problems caused him to lose his appetite, and that he has had trouble getting things done since he left the military because he does not care if he finishes it or not.  (Tr. 489.)  He stated that he even goes days without playing

(Footnote Continued from Previous Page)
workers)."  DSM-IV at 34.

his guitar, which is one of the few things that he likes.  (Tr. 490.)  With respect to his relationships with other people, Plaintiff testified that when he was married, his wife was a "buffer zone," meaning that she was the only person that he would really talk to.  (Tr. 486.)  He sees a friend once a week to play guitar, and sees another friend a couple times a month to do the same, but only spends an hour or two with them, and he sees them at his own house.  (Tr. 492.)  Other than that, he testified that he goes to the grocery store once or twice a month, and he walks his dog daily.  (Tr. 492-93.)  He stated that he only travels to Duluth or the Duluth area when he has to because it is "stressful" for him; he does not travel to Minneapolis.  (Tr. 493-94.)  Plaintiff testified that he has not had a lot of medical treatment for his problems because he claims that the only thing they can do for him is "drug [him] up," and that while the medication probably makes it easier for other people to deal with him, it does not make him any happier.  (Tr. 493.)  He confirmed that he had not taken any medications since probably 1994 or 1995. (Tr. 494.)  But then he also stated that he was on Remeron not too long ago, and that he is technically still on it, but he does not like it because it made him into a "fat irritable zombie."  (*Id.*)

**B.    Witness Testimony**

Paul Olsen, a friend of Plaintiff's who has known him since the seventh

grade, testified at the September 29, 2006 hearing on Plaintiff's behalf.  (Tr. 495.)

Olsen stated that he did not see Plaintiff from 1993 to 1997, because his wife did

not like Plaintiff.  (Tr. 496.)  But after he and his wife divorced in 1997, he started

visiting Plaintiff at least once every two weeks.  (*Id.*)  Olsen testified that Plaintiff

does not have patience for some people, and that he does not visit Plaintiff for

much more than an hour at a time.  (Tr. 497.)  Olsen testified that he drives

Plaintiff when he needs to go out of town because Plaintiff does not have

patience for others driving on the road.  (Tr. 498.)  Olsen testified that he did not

know of an employer who would put up with Plaintiff because his patience does

not last long and he tends to lose interest in projects once he starts them.

(Tr. 498-99.)

**C.    Vocational Expert Testimony**

Kenneth Ogren testified at the administrative hearing as a vocational

expert.  (Tr. 499-504.)  The ALJ first post the following hypothetical to Ogren:

> [A]ssume we have a man in his early 30s, high school education,
> past relevant work as set forth by yourself in Exhibit 17E.  This
> individual is impaired by a major depressive disorder recurrent.  Also
> suffered during this relevant time period from a substance abuse
> disorder that was in remission since early 1997, and also a
> personality disorder . . . . [This person is limited] to work which is
> simple and unskilled, only brief and superficial contacts with co-
> workers and supervisors, and no interaction with the public with
> respect to job duties.  Mr. Ogren, with that [residual functional

capacity ("RFC")], could the claimant do any of his past relevant work?

(Tr. 502.)  Ogren responded by simply stating, "No."  (*Id.*)

The ALJ also asked Ogren whether there were any jobs that fit that RFC. (*Id.*)  Ogren testified that there were.  Specifically, Ogren listed hand packager, rack room worker, night cleaner, and "all kinds of assembly jobs."  (Tr. 502-03.)

The ALJ then asked Ogren whether there were any jobs that the hypothetical person could do if the person, "due to psychological impairments, . . . can't get along with people very well and sometimes he just has had it and has to bail," or if "one day a week conflicts would arise or the person would just have to basically leave the job site sometime during the day because of psychological issues[.]"  (Tr. 503.)  Ogren responded that there were no such jobs.  (*Id.*)

### E.    The ALJ's Decision

On November 16, 2006, the ALJ issued a decision concluding that Plaintiff was not under a disability as defined by the Social Security Act and therefore denying Plaintiff's application for a period of disability and disability insurance benefits.  (Tr. 19-30.)  The ALJ followed the sequential five-step procedure as set out in the Code of Federal Regulations.  *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  The Eighth Circuit has summarized these steps as follows: (1) whether the claimant is currently engaged in "substantial gainful activity"; (2) whether the claimant suffers from a severe impairment that "significantly limits the claimant's physical or mental ability to perform basic work

22

activities"; (3) whether the claimant's impairment "meets or equals a presumptively disabling impairment listed in the regulations (if so, the claimant is disabled without regard to age, education and work experience)"; (4) "whether the claimant has the residual functional capacity ["RFC"] to perform his or her past relevant work"; and (5) if the ALJ finds that the claimant is unable to perform the past relevant work then the burden is on the Commissioner "to prove that there are other jobs in the national economy that the claimant can perform." *Fines v. Apfel*, 149 F.3d 893, 894-95 (8th Cir. 1998).

The ALJ found that Plaintiff had not engaged in substantial gainful activity since his alleged onset date of August 25, 1993, therefore meeting the requirement at the first step of the disability procedure. (Tr. 24.) The ALJ also determined that Plaintiff met the insured status requirements of the Social Security Act through December 31, 1998. (*Id.*) At steps two and three, the ALJ found that prior to December 31, 1998, Plaintiff had severe impairments of "major depressive disorder, recurrent, and history of marijuana abuse in reported remission since 1997[,]" but that Plaintiff did not have an impairment or combination of impairments that met or medically equaled any of the criteria listed in the regulations. (Tr. 24-25.)

The ALJ determined that Plaintiff had the RFC "to perform simple unskilled work; with only brief and superficial contact with coworkers and supervisors; and involving job duties that did not require interaction with the public." (Tr. 25.) And at steps four and five of the disability determination procedure, the ALJ found

that Plaintiff did not retain the RFC to perform any of his past relevant work, but, based on the testimony of the vocational expert, did retain the RFC to make a vocational adjustment to work that exists in significant numbers in the national economy. (Tr. 29-30.)

## DISCUSSION

### I.     Standard of Review

Congress has prescribed the standards by which Social Security disability benefits may be awarded. "Disability" under the Social Security Act means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). "An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

Review by this Court of the Commissioner's decision to deny disability benefits to a claimant is limited to a determination of whether the decision of the Commissioner is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); *Baker v. Barnhart*, 457 F.3d 882, 892 (8th Cir. 2006). "There is a notable difference between 'substantial evidence' and 'substantial evidence on the record as a whole.'" *Gavin v. Heckler*, 811 F.2d 1195, 1199 (8th Cir.

1987). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quotations omitted); *see also Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001) ("Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision."). "'Substantial evidence on the record as a whole,' . . . requires a more scrutinizing analysis." *Gavin*, 811 F.2d at 1199. "The substantial evidence test employed in reviewing administrative findings is more than a mere search of the record for evidence supporting the [Commissioner's] findings." *Id.* In reviewing the administrative decision, "'[t]he substantiality of evidence must take into account whatever in the record fairly detracts from its weight.'" *Id.* (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951)).

In reviewing the record for substantial evidence, the Court may not substitute its own opinion for that of the ALJ. *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993). The Court may not reverse the Commissioner's decision merely because evidence may exist to support the opposite conclusion. *Mitchell v. Shalala*, 25 F.3d 712, 714 (8th Cir. 1994); *see also Woolf*, 3 F.3d at 1213 (concluding that the ALJ's determination must be affirmed, even if substantial evidence would support the opposite finding). The possibility that the Court could draw two inconsistent conclusions from the same record does not prevent

a particular finding from being supported by substantial evidence.  *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994).

The claimant bears the burden of proving his or her entitlement to disability insurance benefits and supplemental security income under the Social Security Act.  *See* 20 C.F.R. §§ 404.1512(a), 416.912(a); *Young v. Apfel*, 221 F.3d 1065, 1069 n.5 (8th Cir. 2000); *Thomas v. Sullivan*, 928 F.2d 255, 260 (8th Cir. 1991). Once the claimant has demonstrated that he or she cannot perform past work due to a disability, "the burden of proof shifts to the Commissioner to prove, first that the claimant retains the residual functional capacity to do other kinds of work, and, second that other work exists in substantial numbers in the national economy that the claimant is able to do."  *Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000).

## II.    Analysis of the ALJ's Decision

Plaintiff raises several issues in support of his motion for summary judgment.  Plaintiff contends that: (1) the ALJ did not give proper weight to the findings of the Veteran's Administration regarding Plaintiff's disability; (2) the ALJ gave inappropriate weight to the opinions of nonexamining reviewers whose opinions are not substantial evidence; (3) the ALJ erred in finding Plaintiff did not meet or equal a listed impairment; (4) the ALJ's RFC finding is not supported by substantial evidence, and therefore the hypothetical question posed to the vocational expert was flawed and is not substantial evidence supporting the

denial of benefits; (5) the ALJ erred in finding Plaintiff not credible; and (6) the ALJ failed to follow the requirements of law in determining onset of disability. This Court will address each of Plaintiff's arguments below.

### A. Determining Onset of Disability

Citing *Grebenick v. Chater*, 121 F.3d 1193, 1201 (8th Cir. 1997) (stating that "[i]f the medical evidence is ambiguous and a retroactive inference is necessary, SSR 83-20 requires the ALJ to call upon the services of a medical advisor to insure that the determination of onset is based upon a 'legitimate medical basis'"), Plaintiff alleges that the Commissioner erred when he failed to obtain a medical review of the record as a whole to determine whether Plaintiff was disabled on or before his date last insured of December 31, 1998. Plaintiff contends that evidence of his GAF scores of 35 and 45 after the alleged August 25, 1993 onset date supports disability, and the ALJ should have obtained medical expert testimony to determine the actual onset date of disability.

Social Security Rule ("SSR") 83-20 sets forth guidelines for determining the onset date of a claimant's disability. The ruling defines the disability onset date as "the first day an individual is disabled as defined in the Act and the regulations." SSR 83-20, 1983 WL 31249 (S.S.A.). "In determining the onset date for disabilities of nontraumatic origin, the ALJ should consider the applicant's allegations, her work history, and the medical and other evidence of her condition." *Id.* at 1200. SSR 83-20 reads in part as follows:

> How long the disease may be determined to have existed at a
> disabling level of severity depends on an informed judgment of the
> facts in a particular case. This judgment, however, must have a
> legitimate medical basis. At the hearing, the administrative law
> judge (ALJ) should call on the services of a medical advisor when
> onset must be inferred.

SSR 83-20. In *Grebenick*, the court addressed the issue of when a medical

advisor is required under SSR 83-20. The court explained that "when there is no

contemporaneous medical documentation, we ask whether the evidence is

ambiguous regarding the possibility that the onset of her disability occurred

before the expiration of her insured status." *Id.* (citing *Reid v. Chater*, 71 F.3d

372, 374 (10th Cir. 1995) ("[A] medical advisor need be called only if the medical

evidence of onset is ambiguous.")).

Here, there was contemporaneous medical evidence upon which the ALJ

relied. And more importantly, as explained further below, the medical evidence

is unambiguous. The records reflect that Plaintiff experienced only mild to

moderate restrictions in activities of daily living, moderate restrictions with regard

to social functioning, and moderate restrictions in maintaining concentration,

persistence, and pace during the relevant time period. The records therefore

unambiguously indicate that Plaintiff's depression had not yet reached a

disabling level and thus there was no need for a medical advisor. Therefore, the

ALJ did not err in not utilizing one at the hearing.

### B.    Meeting or Equaling a Listed Impairment

Plaintiff contends that the ALJ erred by not having a psychiatrist or psychologist review the record as a whole to determine whether he met or equaled a listed impairment.  Defendant responds asserting that Plaintiff has the burden to prove that he met or equaled a listed impairment, and Plaintiff has not met that burden because he has not identified or offered any evidence as to which impairment he met or equaled.

The ALJ found that Plaintiff's impairments neither met nor were medically equal to the requirements of the Listing of Impairments as described in 20 C.F.R. § 404, Subpart P, Appendix 1.[9]  The ALJ specifically referenced that Plaintiff's impairments were evaluated under sections 12.04 and 12.09 of the Listing of Impairments governing affective disorders and substance addiction disorders. (Tr. 25.)  The Listing of Impairments describes, for each of the major body systems, impairments that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his age, education, or work experience.  20 C.F.R. § 404.1525(a).  To meet Listing 12.04 for affective disorders, a claimant must show among other things that he has certain depressive symptoms resulting in at least two of the following: (1) marked restrictions of activities of daily living; (2) marked difficulties in

---

[9]    The fact that the ALJ did not elaborate on this conclusion does not require reversal because the record supports the ALJ's overall conclusion.  *Karlix v. Barnhart*, 457 F.3d 742, 746 (8th Cir. 2006).

maintaining social functioning; (3) marked difficulties in maintaining

concentration, persistence, or pace; or (4) repeated episodes of

decompensation, each of extended duration.  20 C.F.R. § 404, Subpt. P, App. 1,

§ 12.04.  Alternatively, the claimant must show medically documented history of

a chronic affective disorder of at least two years' duration that has caused more

than a minimal limitation of ability to do basic work activities, with symptoms or

signs currently attenuated by medication or psychosocial support, among other

requirements.  *Id.*  If the requirements of depressive syndrome are met under §

12.04, then the required level of severity for a § 12.09 substance addiction

disorder is met.  *Id.* § 12.09.  An impairment or impairments that do not meet the

criteria of a Listing can medically equal the criteria and establish disability.  20

C.F.R. §§ 404.1525(c)(5), 404.1526(b)(3).

    "The [ALJ] or Appeals Council is responsible for deciding the ultimate legal

question whether a listing is met or equaled."  SSR 96-6p, [2002 Supplementary

Pamphlet] Soc. Security Reporting Service: Rulings (West) at 131.  "As trier of

the facts, an [ALJ] or the Appeals Council is not bound by a finding by a state

agency medical or psychological consultant or other program physician or

psychologist as to whether an individual's impairment(s) is equivalent in severity

to any impairment in the Listing of Impairments."  *Id.*  "However, longstanding

policy requires that the judgment of a physician (or psychologist) designated by

the Commissioner on the issue of equivalence on the evidence before the [ALJ]

or the Appeals Council must be received into the record as expert opinion

evidence and given appropriate weight." *Id.* This "does not require the ALJ to provide a new medical evaluation for a claimant whenever a State medical or psychological consultant has addressed the issue of equivalency." *Jones ex rel. Morris v. Barnhart*, 315 F.3d 974, 978 (8th Cir. 2003). "'[T]he requirement to receive expert opinion evidence into the record' on the issue of equivalence 'may be satisfied by [various types of] documents signed by a State agency medical or psychological consultant.'" *Id.* at 979 (quoting SSR 96-6p at 131). Such documents may include a Disability Determination and Transmittal Form signed by a State agency medical or psychological consultant, a Psychiatric Review Technique Form, or various other documents on which medical and psychological consultants may record their findings. SSR 96-6p at 131. An ALJ must, however, obtain an updated medical opinion from a medical expert in the following two circumstances:

> [1.] When no additional medical evidence is received, but in the opinion of the administrative law judge or the Appeals Council the symptoms, signs, and laboratory findings reported in the case record suggest that a judgment of equivalence may be reasonable; or
>
> [2.] When additional medical evidence is received that in the opinion of the administrative law judge or Appeals Council may change that State agency medical or psychological consultant's finding that the impairment(s) is not equivalent in severity to any impairment in the Listing of Impairments.

*Id.*

Here, the record contains expert opinion evidence in the form of a

Disability Determination and Transmittal Form and a Psychiatric Review

Technique Form, both signed by Dr. Shields, a State agency psychologist. (Tr.

41-43, 310-25.) And neither of the circumstances requiring an updated medical

opinion is present. Therefore, by giving the appropriate weight to the expert

opinion, the ALJ did not err in making a determination as to whether Plaintiff met

or equaled a listed impairment on the basis of the record, and Plaintiff's

argument fails.

**C.      The Findings of the Veteran's Administration**

Plaintiff contends the only consideration the ALJ gave to the VA's finding

that Plaintiff was disabled was to state that the regulations for establishing

disability under the Social Security Administration are different from those of the

Veteran's Administration. Plaintiff argues the Eighth Circuit Court of Appeals in

*Morrison v. Apfel*, 146 F.3d 625, 628 (8th Cir. 1998), and SSR 06-3p reject that

approach. Defendant disagrees and asserts that the ALJ thoroughly reviewed

the medical evidence upon which the Veteran's Administration disability

determination was made and appropriately relied on the Social Security

regulations for determining disability.

Both *Morrison* and SSR 06-3p require the ALJ to consider the VA's finding

of disability. *Morrison*, 146 F.3d at 628; SSR 06-3p. However, "the ALJ is not

bound by the disability rating of another agency when he is evaluating whether

the claimant is disabled for purposes of social security benefits[.]" *Pelkey v.*

*Barnhart*, 433 F.3d 575, 579 (8th Cir. 2006) (citing 20 C.F.R. § 404.1504; *Fisher v. Shalala*, 41 F.3d 1261, 1262 (8th Cir. 1994) (per curiam) ("There is no support for [the claimant's] contention that his sixty-percent service-connected disability rating equates with an inability to engage in any substantial gainful activity under social security standards.")).  In addition, "[a]lthough *Morrison* states that an ALJ should state her reasons for rejecting the VA's disability findings, the Eighth Circuit has since held that an ALJ gives proper consideration to a VA disability determination if she considers and discusses 'the underlying medical evidence contained in the VA's Rating Decision.'"  *Rael v. Soc. Sec. Admin.*, No.8:07CV432, 2008 WL 4279707, *14 (D. Neb. Sept. 16, 2008) (quoting *Pelkey*, 433 F.3d 575).[10]

Here, the ALJ considered and discussed the medical evidence underlying the VA's disability determination.  Although the ALJ ultimately rejected the VA's determination that Plaintiff was disabled, the ALJ based his findings that Plaintiff suffered severe impairments of major depressive disorder, recurrent, and

_____

[10]    *Pelkey* was decided before SSR 06-03p became effective, and as the *Rael* court indicated, "one might reasonably question whether discussing the evidence underlying the disability decision of another agency – without explaining the consideration given to the decision itself – is fully consistent with the policy interpretation set forth in the Social Security Ruling."  *Id.*; *see* SSR 06-03p at *7 (stating that "adjudicator[s] should explain the consideration given to these decisions").  However, based on current Eighth Circuit precedent, discussion of the underlying medical evidence contained in the VA's Rating Decision by the ALJ is sufficient.  *See Pelkey*, 433 F.3d at 579-80 (concluding that the ALJ did not err because he "considered and discussed the underlying medical evidence contained in the VA's Rating Decision").

marijuana abuse in reported remission since 1997, on Drs. Chang and Whitacre's medical reports, and also considered Drs. Chang and Whitacre's medical reports in finding that Plaintiff did not meet or equal a listed impairment, and in determining Plaintiff's residual functional capacity.  (Tr. 24-28.)

In the ALJ's discussion, among other things, he noted that "the record documents that [Plaintiff] experienced only mild to moderate symptoms secondary to his mental impairments, and that "prior to [Plaintiff's] date last insured, he only met with the Veterans Administration psychiatrists on an infrequent basis for the purposes of maintaining his veteran's benefits."  (Tr. 27.)  The ALJ also noted that Plaintiff reported to Dr. Whitacre in 1997 that he did not receive any treatment or take any medications for depression for two years.  (*Id.*)  In addition, the ALJ did not give significant weight to Dr. Chang's opinion that Plaintiff was unemployed due to anxiety attacks at work because there was no objective evidence in the record to support Plaintiff's report of anxiety attacks.  The ALJ also did not give significant weight to Dr. Whitacre's opinion that Plaintiff had a GAF score of 50 in April 1997, because "the GAF score estimate reflects the claimant's functioning at one point in time and not over a period of time."  (Tr. 27-28.)  After this discussion, the ALJ acknowledged that the claimant received disability benefits from the Veteran's Administration after being discharged from the Air Force, but concluded that Plaintiff's VA disability status should not be given significant weight because the Social Security regulations for determining disability were different from the VA's regulations.  (Tr. 28.)

34

Considering the ALJ's discussion as a whole, the ALJ gave proper consideration to the VA disability determination.

### D.    Nonexamining Consultant's Opinion

A treating physician's opinion is typically entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory and diagnostic techniques" and not inconsistent with other substantial evidence in the record. *Leckenby v. Astrue*, 487 F.3d 626, 632 (8th Cir. 2007) (quoting *Prosch v. Apfel*, 201 F.3d 1010, 1012-13 (8th Cir. 2000)).  "An ALJ may discount such an opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions."  *Holmstrom v. Massanari*, 270 F.3d 715, 720 (8th Cir. 2001).  "A non-treating physician's assessment does not alone constitute substantial evidence if it conflicts with the assessment of a treating physician."  *Lehnartz v. Barnhart*, 142 Fed. Appx. 939, 942 (8th Cir. 2005).  Also, "the ALJ must not substitute his opinion for that of the physician."  *Ness v. Sullivan*, 904 F.2d 432, 435 (8th Cir. 1990).

If an ALJ determines not to grant controlling weight to a treating physician's opinion, medical opinions are further evaluated under the framework described in 20 C.F.R. § 404.1527.  Under such framework, the ALJ should consider the following factors in according weight to medical opinions: (1) whether the source has examined the claimant; (2) the length of the treatment relationship and the frequency of examination; (3) the nature and extent of the

treatment relationship; (4) the quantity of evidence in support of the opinion; (5) the consistency of the opinion with the record as a whole; and (6) whether the source is also a specialist.  20 C.F.R. § 404.1527(d).

In addition, an ALJ must explain the weight given to the opinion of a nonexamining State agency consultant.  *Willcockson v. Astrue*, 540 F.3d 878, 880 (8th Cir. 2008) (citing 20 C.F.R. § 404.1527(f)(2)(ii)).  The ALJ should evaluate the degree to which the nonexamining source considered all of the pertinent evidence, and provided support for his decision.  (*Id.*)    However, the ALJ may reject the opinion of any medical expert, whether hired by the claimant or the government, if the opinion is inconsistent with the record as a whole. *Wagner v. Astrue*, 499 F.3d 842, 848 (8th Cir. 2007).

Plaintiff contends that it was error for the ALJ to give significant weight to the opinions of non-examining State Agency reviewers and asserts that their opinions were not entitled to any weight because much of the record was missing from their review, including 1992 and 1994 mental health records from the VA and Dr. Toonstra's report from his psychological consultative examination of Plaintiff.  Plaintiff contends the ALJ should have granted greater weight to the examining sources, Drs. Chang, Whitacre, and Toonstra.  Plaintiff also argues that it was error for the ALJ to fail to consider treating physician Dr. Spencer's opinion, even though Dr. Spencer did not treat Plaintiff until after his date last insured.

There are three examining sources whose "opinions" the ALJ granted little weight. The first is Dr. Chang's "opinion." Dr. Chang examined Plaintiff once in 1994 and diagnosed major depressive disorder. (Tr. 235, 237-38.) Dr. Chang did not opine that Plaintiff could not work, but noted that "[c]urrently he is unemployed due to the excessive anxiety attacks on the job." (Tr. 235.) The ALJ did not give this conclusion significant weight because it was not supported by objective medical evidence in the record. (Tr. 27.) Although Plaintiff was treated for stress while in the Air Force, he was not treated for anxiety attacks that precluded work. (Tr. 207-09.) And the only evidence of anxiety attacks during the relevant time period is Plaintiff's self report to Dr. Chang, and Dr. Chang did not diagnose anxiety. (Tr. 237-38.) Therefore, because it was not supported by objective medical evidence, the ALJ properly declined to give controlling weight to Dr. Chang's "opinion."

Dr. Whitacre, the second examining source whose opinion the ALJ granted little weight, examined Plaintiff once a year from 1995 through 1997, and diagnosed major depression upon each examination. (Tr. 226-31, 233-34.) Even though the Veteran's Administration granted disability benefits based on their medical evaluations, like Dr. Chang, Dr. Whitacre never opined that Plaintiff was incapable of working. Dr. Whitacre did, however, assign Plaintiff a GAF score of 50 in April 1997, indicating serious to moderate psychological symptoms. (Tr. 223.) The ALJ considered but did not give significant weight to this "opinion" because "the GAF score estimate reflects the claimant's functioning

at one point in time and not over a period of time[,]" and the GAF score was not intended to be used for the purposes of evaluating disability. (Tr. 28.)

GAF scores may be relevant evidence, but they can be discounted if inconsistent with other evidence in the record. *See England v. Astrue*, 490 F.3d 1017, 1023 n.8 (8th Cir. 2007) (citing *Hudson ex rel Jones v. Barnhart*, 345 F.3d 661, 666 (8th Cir. 2003)). Here, the ALJ noted that Dr. Whitacre found Plaintiff to be pleasant, cooperative, oriented, alert, with a coherent and relevant thought process, and appeared only "somewhat depressed." (Tr. 26-27.) The ALJ also considered that Plaintiff did not receive any treatment for his symptoms prior to December 31, 1998, and his daily activities were inconsistent with total disability. (Tr. 27.) Because Dr. Whitacre's assignment of a GAF score of 50 in April 1997 is inconsistent with other evidence in the record, this Court cannot say that the ALJ erred in declining to give controlling weight to Dr. Whitacre's "opinion."

The third examining source was the psychological consultative examiner, Dr. Toonstra. In 2004, he opined that Plaintiff was capable of understanding, remembering, and following simple instructions, with some difficulty sustaining attention and "carrying out work-like tasks with reasonable persistence or pace"; "capable of responding appropriately to brief and superficial contact with coworkers and supervisors[,]" but "likely would not tolerate well the stress and pressure typically found at entry-level workplace"; and his schizoid personality features would "likely amplify problems experienced in interacting with others and following through with directions." (Tr. 372.) The ALJ did not give Dr. Toonstra's

38

opinion significant weight because it was offered nearly four years after Plaintiff's date last insured, was based on a one-time evaluation session, and appeared to be based largely on the claimant's own report of his symptoms. (Tr. 27-28.) On the other hand, the ALJ found the nonexamining State Agency physician's opinions consistent with the objective psychological evidence during the relevant time period. Even though Dr. Toonstra personally examined Plaintiff, while the non-examining State Agency physicians did not, Dr. Toonstra's opinion that Plaintiff would likely have difficulty tolerating the stress found in an entry-level job is not supported by objective medical evidence for the relevant time period and conflicts with some of Dr. Toonstra's own opinions. For example, Dr. Toonstra's October 15, 2004 report indicates that he administered the MMPI-2 to Plaintiff, and that the results "suggest[ed] the strong possibility of a blatant response set of over-representing mental health problems[,]" and that "the response set is likely the results of desire to present in a light suggestive of mental-health problems." (Tr. 370.) In addition, Dr. Toonstra noted that Plaintiff "does appear to be capable of handling his own funds identifying that he has historically been able to provide his own daily needs such as food, clothing, and shelter." (Tr. 372.) Moreover, while Dr. Toonstra stated that Plaintiff would "likely" not tolerate the stress found in an entry-level job and that his personality features would "likely" amplify problems, he did not opine that Plaintiff would be unable to perform the activities required in an entry-level job. Therefore, this Court cannot

say that the ALJ erred in declining to give controlling weight to Dr. Toonstra's "opinion."

Finally, Plaintiff cites *Jones v. Chater*, 65 F.3d 102 (8th Cir. 1995) for the proposition that the ALJ must consider Dr. Spencer's opinion. Plaintiff, however, does not identify which opinion of Dr. Spencer's that he believes the ALJ should have considered that supports Plaintiff's position. Nonetheless, the issue in *Jones* was "whether retrospective medical diagnoses uncorroborated by contemporaneous medical reports but corroborated by lay evidence relating back to the claimed period of disability can support a finding of past impairment." *Id.* at 103. The Eighth Circuit held that it could, but because the ALJ failed to address the underlying issues, it found it unable to determine whether the ALJ properly rejected the medical opinions, and remanded "to fill this void in the record." *Id.* at 104. Here, Dr. Spencer was not asked to and did not render a *retrospective* diagnosis. (Tr. 263-65.) Therefore, Plaintiff's argument fails.

Furthermore, in addition to the medical source opinions, the ALJ considered Plaintiff's lack of treatment for depression, his daily activities— including volunteering to host a radio show and playing music with friends, and that Plaintiff's lack of work after service in the Air Force may have resulted from his lack of interest or need for full-time employment because he received disability benefits from the VA. (Tr. 26-28.) Thus, there is substantial evidence in the record as a whole, and good reason for the ALJ to adopt Dr. Shields's

opinion and discount Dr. Toonstra's opinion.[11]  *See Casey v. Astrue*, 503 F.3d 687, 694 (8th Cir. 2007) (affirming ALJ's decision to grant more weight to nonexamining reviewer's opinion because the opinion was consistent with record as a whole.)

### E.     Credibility Analysis

Plaintiff asserts that his work history, the findings of examining mental health professionals, the statements of witnesses, and the effect of Plaintiff's impairments on his ability to function in society are inconsistent with the ALJ's credibility finding.  Defendant counters that Plaintiff ignores facts negatively affecting his credibility, such as the documented reason for him leaving the Air Force and his receipt of benefits after leaving the Air Force.  Furthermore, Defendant contends the ALJ's credibility analysis is supported by the fact Plaintiff did not receive treatment for his mental health problems during the relevant time period.

When determining the credibility of a claimant's subjective allegations, the ALJ must consider evidence such as: (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of medication; and (5) functional restrictions.  *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984).  The ALJ must take these factors into account, but does not need to

---

[11]      *See supra* p. 14-16.

discuss how each factor relates to plaintiff's credibility. *Casey v. Astrue*, 503 F.3d 687, 695 (8th Cir. 2007) (citing *Tucker v. Barnhart*, 363 F.3d 781, 783 (8th Cir. 2004)). The ALJ may discredit subjective complaints when they are inconsistent with the evidence as a whole. *Id.* But the ALJ must detail his reasons for discrediting the testimony. *Cline v. Sullivan*, 939 F.2d 560, 565 (8th Cir. 1991). "If an ALJ explicitly discredits the claimant's testimony and gives good reason for doing so, [the Court] will normally defer to the ALJ's credibility determination." *Gregg v. Barnhart*, 354 F.3d 710, 714 (8th Cir. 2003); *see also Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir. 1992) (stating that even if the record could support more than one reasonable conclusion, the reviewing court should affirm the Commissioner's reasonable conclusion).

Plaintiff asserts that he is unable to work because of a major depressive disorder and an anxiety disorder with panic attacks. The ALJ ultimately found that "the [Plaintiff's] medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that the [Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." (Tr. 28-29.) Throughout the ALJ's decision, the ALJ cited to numerous inconsistencies in the record that support reducing Plaintiff's credibility. For example, the ALJ notes that "the record does not document that he was diagnosed as having an anxiety disorder, or that he experienced any ongoing panic attacks." (Tr. 27.) In addition, the ALJ found Plaintiff's

42

impairments prior to December 31, 1998, to be inconsistent with total disability,

after stating the following:

> [P]rior to December 31, 1998, the record does not document that the [Plaintiff] received any ongoing treatment for depression, or that he took any medications to treat the symptoms of his impairments. Furthermore, the record documents that he experienced only mild to moderate symptoms secondary to his mental impairments, and that prior to his date last insured he only met with the Veterans Administration psychiatrists on an infrequent basis for the purposes of maintaining his veteran's benefits. Finally, the [Plaintiff's] daily activities outlined above are inconsistent with total disability.

(*Id.*) Regarding Plaintiff's daily activities, the ALJ had noted that during the

relevant time period, Plaintiff, among other things, played in a band, went fishing,

wrote short stories, cooked, brewed his own beer, maintained his own house and

yeard, volunteered as a radio host, cared for a dog, drove his mother around,

and volunteered for Wheels on Meals. (Tr. 26.) In addition, the ALJ viewed

Plaintiff's service in the Air Force to his credit, but simply noted that his receipt of

disability payments after discharge from the Air Force might have resulted in the

lack of interest or need for full-time employment. (Tr. 28.) The ALJ also noted

that Plaintiff was discharged from the Air Force secondary to a positive urinalysis

for marijuana, and that Dr. Chang was not certain whether Plaintiff's depression

was due to substance use or dismissal from the Air Force. (Tr. 27.) "Courts

have found it relevant to credibility when a claimant leaves work for reasons

other than her medical condition." *Goff v. Barnhart*, 421 F.3d 785, 793 (8th Cir.

2005). Here, there is no evidence prior or contemporaneous to Plaintiff's

discharge to support a finding that claimant could not perform his duties in the Air Force for any reason other than marijuana use.

Because the ALJ thoroughly discussed—based on the record evidence—the reasons why Plaintiff's subjective statements concerning the intensity, persistence, and limiting effects of his symptoms are not entirely credible, and because the ALJ utilized the *Polaski* factors in doing so, this Court concludes that the ALJ properly assessed the evidence and the record as a whole, and that the ALJ's assessment of Plaintiff's credibility is supported by substantial evidence. *See Jones v. Callahan*, 122 F.3d 1148, 1153 (8th Cir. 1997) (affirming ALJ where claimant was not undergoing any regular treatment with a mental health professional or taking medication for emotional symptoms, and daily activities were not restricted due to emotional causes.)

### F. The Vocational Expert's Hypotheticals

Plaintiff contends that because the ALJ's first hypothetical question to the vocational expert was based on a nonexamining reviewer's medical opinion, it was not supported by substantial evidence on the record as a whole. On the other hand, Plaintiff contends that the second hypothetical question posed to the vocational expert was supported by the record as a whole, and supports a finding of disability.

"A hypothetical question is properly formulated if it sets forth impairments 'supported by substantial evidence in the record and accepted as true by the

ALJ." *Guilliams v. Barnhart*, 393 F.3d 798, 804 (8th Cir. 2005) (quoting *Davis v. Apfel*, 239 F.3d 962, 966 (8th Cir. 2001)). "Testimony from a [vocational expert] based on a properly-phrased hypothetical question constitutes substantial evidence." *Roe v. Chater*, 92 F.3d 672, 675 (8th Cir. 1996).

As explained above in Section II.D., this Court concludes that there is substantial evidence in the record as a whole, and good reason for the ALJ to adopt Dr. Shields's opinion and to discount several of Plaintiff's treating physicians' opinions. Thus, the ALJ's hypothetical question based on Dr. Shields's opinion was proper and the vocational expert's conclusion based on that hypothetical was proper as well.[12]

## RECOMMENDATION

Based on the foregoing, and all the files, records, and proceedings herein,

**IT IS HEREBY RECOMMENDED** that:

1.     Plaintiff's Motion for Summary Judgment (Doc. No. 6), be

**DENIED**;

2.     Defendant's Motion for Summary Judgment (Doc. No. 14), be

**GRANTED**;

---

[12]     This Court notes that, having reviewed the record, including the opinions and assessments of the various physicians and experts, it finds that there is substantial evidence in the record to support the Commissioner's decision regarding Plaintiff's RFC and his ability to perform other jobs in the national economy. *See Cruze v Chater*, 85 F.3d 1320, 1326 (8th Cir. 1996) (finding vocational expert's testimony which was based on a properly phrased

(Footnote Continued on Next Page)

3.    The decision of the Commissioner of Social Security be **AFFIRMED**;

and

4.    This case be **DISMISSED WITH PREJUDICE**.


Date: July 14, 2009                        __*s/Jeffrey J. Keyes*_____
                                           JEFFREY J. KEYES
                                           United States Magistrate Judge


Under D. Minn. LR 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **July 28, 2009**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections. Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals. A party may respond to the objecting party's brief within ten days after service thereof. A judge shall make a de novo determination of those portions to which objection is made. This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable to the Court of Appeals.

---

(Footnote Continued from Previous Page)
hypothetical question sufficient to support the ALJ's decision).